UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TITUS WILLIS,

                Plaintiff,                   Civil Action No. 21-11184

v.                                        Paul D. Borman
                                        United States District Judge

CORIZON OF MICHIGAN, *et al.*,

                                        David R. Grand
                Defendants.         United States Magistrate Judge
_____/

## REPORT AND RECOMMENDATION TO GRANT IN PART AND DENY IN PART MICHIGAN DEPARTMENT OF CORECTIONS DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF No. 37), AND TO GRANT THE OTHER DEFENDANTS' DISPOSITIVE MOTIONS (ECF Nos. 15, 26, 33)

*Pro se* plaintiff Titus Willis ("Willis"), an incarcerated person, brings this civil rights action pursuant to 42 U.S.C. § 1983, alleging violations of his Eighth Amendment rights against 46 defendants, consisting of: (1) the Michigan Department of Corrections' ("MDOC") Duane Waters Hospital and various MDOC employees ("MDOC Defendants"); (2) Corizon Health, Inc. and various of its employees ("Corizon Defendants"); (3) a group of radiologists ("Radiologist Defendants"); and (4) Henry Ford Allegiance Hospital, Inc. and various of its related entities and employees ("Henry Ford Defendants"), based on deliberate indifference to a serious medical need. (ECF No. 1). The case was referred to the undersigned for all pretrial matters pursuant to 28 U.S.C. § 636(b). (ECF No. 7).

Each of these four defendant groups has filed separate dispositive motions. (ECF Nos. 15, 26, 33, 37). Willis filed a response to each motion, (ECF Nos. 45, 46, 48, 49),

and the MDOC Defendants, Corizon Defendants, and Radiologist Defendants each filed a reply.  (ECF Nos. 50, 53, 56).

## I.     RECOMMENDATION

For the reasons set forth below, **IT IS RECOMMENDED** that the MDOC Defendants' Motion for Summary Judgment **(ECF No. 37)** be **GRANTED IN PART AND DENIED IN PART**, and that the Corizon Defendants' Motion for Summary Judgment **(ECF No. 15)**, the Radiologist Defendants' Motion to Dismiss and for Summary Judgment **(ECF No. 26)**, and the Henry Ford Defendants' Motion to Dismiss **(ECF No. 33)**, be **GRANTED**.

## II.    REPORT

### A.     Background

Willis is a MDOC prisoner who is currently confined at the Lakeland Correctional Facility ("LCF") in Coldwater, MI.  He brings this § 1983 civil rights action, alleging violations of his rights under the Eighth Amendment based on deliberate indifference to a serious medical need, as well as state law claims of gross negligence and/or wanton and willful misconduct.  At the time of the events at issue in his complaint, Willis was housed at the G. Robert Cotton Correctional Facility ("JCF") in Jackson, Michigan.

In his complaint, Willis alleges that he experienced a "heart attack" or "stroke" in the "D-unit bathroom stall" of JCF shortly before midnight on June 6, 2018, and that two JCF nurses – one of the MDOC Defendants, Nurse Sophia Bradley, R.N., as well as Nurse

Laura B. Davenport, R.N.[1] – "maliciously, sadistically and intentionally misdiagnos[ed] [him] inhumanly as a opioid overdose patient and unconstitutionally administered 3 separate doses of Narcan injections . . . causing an allergic reaction and Narcan poisoning forcing [him] to suffer a unnecessary wanton infliction of pain and cruel and unusual punishment . . ." (¶¶52, 64).[2]   Specifically, he alleges that Davenport "ordered [] Bradley to cruelly and with the intentions to cause a severe amount of unnecessary wanton infliction of life threatening pain and suffering to administer 7 to 8 dosages of Narcan."  (¶64). Bradley, who was "untrained" to handle his "life threatening conditions," then "unconstitutionally administered 3 separate doses of Narcan injections" in "4 mg., 2 mg., and 2 mg., doses causing an allergic reaction and Narcan poisoning."  (¶¶52-53).  Willis claims that Bradley's "failure to diagnose [his] actual medical issues," as well as her administration of "the wrong drug (Narcan)[] that caused an allergic reaction and Narcan poisoning," was "done intentionally to deprive [him] from receiving adequate medical care from every treating M.D. and D.O. physician thereafter, named within this Complaint." (¶54).

Willis further alleges that Bradley "intentionally ignored" correctional officers' and other inmates' pleas to "stop administer[ing] Narcan" because Willis was not a "drug user," and instead "continued to inject and spray [] until Warden Anthony Stewar[t] ordered her

---

[1] On August 23, 2021, the U.S. Marshal Service acknowledged receipt of service of process documents for Davenport (ECF No. 8, PageID.16), but, to date, the docket does not reflect any subsequent entries concerning the status of service on Davenport.  Thus, Davenport appears to remain unserved, and the Court will issue an appropriate order regarding the lack of service.

[2] Standalone citations to "¶__" are all to Willis' complaint, found at ECF No. 1.

3

to stop because he kn[e]w Willis did not have a history of drug usage." (¶55).

Willis also asserts that despite later receiving a toxicology report indicating that he did not have any drugs in his system, Bradley "never notified anyone that she had made a mistake[] so a different form of medical treatment could be provided," and Davenport "never contacted any one to prevent the ongoing pain and immense suffering that [he] was going through and erroneous medical reports that was being followed by every" subsequent doctor who treated him, which resulted in him never receiving "the appropriate medical treatment for Narcan poisoning and Narcan overdose." (¶¶57, 66).

Willis alleges that, "between the hours of 12:38am to 1:10am," he encountered another of the MDOC Defendants, EMS Paramedic Darel Woolsey. (¶76). Willis alleges Woolsey was deliberately indifferent by "depriving [him] of a complete medical examination and relying on [] inaccurate misdiagnoses" from Bradley and Davenport. (¶76). Woolsey also was "not trained for this type of emergency medical call or medical treatment," and he "passed on erroneous[] [information] to the medical staff of Duane Waters Emergency room," who "continued the same type of medical procedures with Narcan as a treatment for opioid overdose." (¶78). During this medical emergency at JCF, some prisoners allegedly heard Woolsey saying, "I'm tired of these guys coming to prison using drugs then overdosing as if we were supposed to save them. I wouldn't care if he died." (ECF No. 1-4, PageID.47; *see also id.*, PageID.45). Willis accuses Woolsey of disregarding "the excessive risk associated with a lethal dosage of Narcan," failing to provide "appropriate medical care to evaluate and treat his correct medical condition," and failing to take "any necessary further actions to assist [him], despite becoming aware of his

4

obvious mistakes after reviewing the toxicology report showing no drugs in [Willis']
system." (¶¶80-81).

In addition to naming Bradley, Davenport, and Woolsey as defendants in his
complaint, Willis appears to name every health care provider entity and practitioner that
had any involvement with his related treatment.  For instance, he alleges he was similarly
"infected" by Dr. Charles Jamsen's deliberate indifference and failure to warn other doctors
of Bradley's and Davenport's misdiagnosis.  (¶¶86-90).  Willis' issue with Dr. Jamsen
appears to stem from a "Nurse Protocol" report completed by Davenport after the incident,
which lists Dr. Jamsen as the "on call provider."  (ECF No. 1-7, PageID.59; ECF No. 1-8,
PageID.61; ECF No. 1-11, PageID.71).   Willis raises similar allegations against Dr.
Christopher Lao, who allegedly saw him later inside the Duane Waters Hospital ("DWH")
Emergency room at "2:27 a.m." on June 7, 2018, as well as Dr. Pauline Chiu, who allegedly
saw him at "5:30 a.m." later that day inside Henry Ford Allegiance Hospital ("HFAH").
(¶¶95-99, 102-06).  Willis then names as defendants the "remaining . . . 34 doctors" who
allegedly saw and/or treated him in HFAH or DWH at some point between June 7, 2018,
through December 31, 2018, for failure to provide him with "appropriate medical care," to
take "any further actions to assist [him], despite becoming aware of [the initial
misdiagnosis]," and to "follow-up" with him in this care.  (¶¶108-18).  Ultimately, Willis
claims that as a result of the treatment he did and did not receive, he spent 4-plus months

in a coma[3] and was left with a slew of serious "irreparable injuries."  (¶53).

Finally, Willis alleges that the MDOC, Corizon Health, Inc., and MDOC's Warden Anthony Stewart have municipal and supervisory liability based on their alleged failure to "properly train and supervise their employees to provide necessary medical care to inmates" at JCF, and their alleged "widespread policy and pattern of inadequate medical care, inadequate access to medical care, and inadequate correctional and medical staffing at the prisons."  (¶¶119-34).

## B.    Standards of Review

### 1.   Motion to Dismiss

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) tests a complaint's legal sufficiency.  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  The plausibility standard "does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct]."  *Twombly*, 550 U.S. at 556.  Put another way, the complaint's allegations "must

---

[3] The medical records attached to Willis' complaint reflect that, after he was admitted to HFAH on June 7, 2018, he was discharged from the hospital on July 18, 2018 in "fair" condition and was "standing."  (ECF No. 1-17, PageID.112-17).

do more than create speculation or suspicion of a legally cognizable cause of action; they must show *entitlement* to relief." *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007) (emphasis in original) (citing *Twombly*, 550 U.S. at 555-56).

Pleadings filed by *pro se* litigants are entitled to a more liberal reading than would be afforded to formal pleadings drafted by lawyers. *See Thomas v. Eby*, 481 F.3d 434, 437 (6th Cir. 2007). Nonetheless, "[t]he leniency granted to pro se [litigants] . . . is not boundless," *Martin v. Overton*, 391 F.3d 710, 714 (6th Cir. 2004), and "such complaints still must plead sufficient facts to show a redressable legal wrong has been committed." *Baker v. Salvation Army*, 2011 WL 1233200, at *3 (E.D. Mich. Mar. 30, 2011).

### 2. Motion for Summary Judgment

Pursuant to Federal Rule of Civil Procedure 56, the Court will grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Pittman v. Cuyahoga Cnty. Dep't of Children & Family Servs.*, 640 F.3d 716, 723 (6th Cir. 2011). A fact is material if it might affect the outcome of the case under governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material fact exists, the Court assumes the truth of the non-moving party's evidence and construes all reasonable inferences from that evidence in the light most favorable to the non-moving party. *See Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006).

The party seeking summary judgment bears the initial burden of informing the Court of the basis for its motion and must identify particular portions of the record that

7

demonstrate the absence of a genuine dispute as to any material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009).  "Once the moving party satisfies its burden, 'the burden shifts to the nonmoving party to set forth specific facts showing a triable issue.'"  *Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 453 (6th Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  In response to a summary judgment motion, the opposing party may not rest on its pleadings, nor "'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion."  *Alexander*, 576 F.3d at 558 (internal quotations omitted).

### C.  Analysis

The motions before the Court raise only a few discrete arguments.  First, all defendants argue that Willis failed to properly exhaust his claims against them.  Second, the MDOC Defendants seek dismissal of Willis' official capacity claims against them based on Eleventh Amendment sovereign immunity.  Finally, the Radiologist Defendants and Henry Ford Defendants argue that all claims against them should be dismissed under Fed. R. Civ. P. 12(b)(6).  The Court will address each of these arguments in turn.

#### 1.  Exhaustion

Willis files his "civil rights complaint" against all defendants for "damages and relief under 42 U.S.C. § 1983, for prohibited behavior in violation of the Eighth Amendment of the United States Constitution."  (ECF No. 1, PageID.2).  He also states in his complaint that his claims are based on the "acts and omissions" by each group of

8

defendants in addressing his serious medical needs, which were "in violation of PD 03.03.130, and PD 02.03.100."[4]  (¶¶52, 64, 76, 92, 99, 106, 114-16).  Based on the above, the Court understands Willis' complaint as alleging that each of the MDOC Defendants, Corizon Defendants, Radiologist Defendants, and Henry Ford Defendants, while providing medical services for inmates on behalf of the MDOC "under the color of state law," failed to provide adequate medical care as required under applicable MDOC Policy Directives, which violated his Eighth Amendment rights.  (¶115; *see* ¶137 (*"[I]n taking custody of [] Willis*, Defendants undertook and owed a non-delegable duty under the Eighth Amendment to provide adequate health care to inmates and to Willis and to make reasonable effort[s] to care for him . . . *in accordance with the customs, policies, and procedures of the G. Robert Cotton Correctional Facility in Jackson, MI.*") (emphasis added)); *see also Kensu*, 2013 WL 1774637, at *6 ("A private entity which contracts with the state to perform a traditional state function like providing healthcare to inmates – like the Corizon Corporations – can be sued under § 1983 as one acting under color of state law.") (quotations omitted).  As such, his Eighth Amendment claims against all defendants in this case are subject to the exhaustion requirement under the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a). *See Kitchen v. Snyder*, No. 20-1936, 2021 WL 4470032

---

[4] To the extent any of Willis' constitutional claims are based on the alleged violation of an MDOC policy, those claims fail as a matter of law because prison officials are not required to follow their own procedural statutes and rules as a matter of federal due process. *See, e.g.*, *Coleman v. Martin*, 363 F. Supp. 2d 894, 903 (E.D. Mich. 2005) ("the failure of a prison, or the state, to follow its own policies and procedures does not amount to a constitutional violation."); *Sweeton v. Brown*, 27 F.3d 1162, 1164 (6th Cir.1994) (prison regulations "do not create an independent federal due process liberty interest or right in the prisoner.").

(6th Cir. June 23, 2021) ("Courts in this circuit have recognized that a prisoner must file a grievance against service providers like Corizon to exhaust administrative remedies.") (listing cases).[5]

### a. Exhaustion Standards

Under the PLRA, a prisoner may not bring an action "under [§ 1983] or any other Federal law" to challenge his conditions of confinement until all available administrative remedies have been exhausted.  42 U.S.C. § 1997e(a); *Woodford v. Ngo*, 548 U.S. 81, 85 (2006).  This "exhaustion" requirement serves two main purposes: it promotes efficiency by encouraging the resolution of claims at the agency level before litigation is commenced, and it protects administrative authority by allowing the agency an opportunity to correct its own mistakes before being haled into federal court.  *See Woodford*, 548 U.S. at 89.  The Supreme Court has held that this "exhaustion requirement requires proper exhaustion." *Id.* at 93.  Proper exhaustion requires "compliance with an agency's deadlines and other critical procedural rules." *Id.* at 90.  Failure to exhaust is an affirmative defense that must be raised by a defendant, and on which the defendant bears the burden of proof.  *See Jones v. Bock*, 549 U.S. 199, 216 (2007); *Vandiver v. Corr. Med. Servs., Inc.*, 326 F. App'x 885, 888 (6th Cir. 2009).

In determining whether a plaintiff has properly exhausted his claim, the only relevant rules "are defined not by the PLRA, but by the prison grievance process itself."

---

[5] *See also Bennett v. Mich. Dep't of Corr.*, No. 15-CV-14465, 2022 WL 957529, at *10 (E.D. Mich. Mar. 29, 2022) (rejecting prisoner's argument that his claims were against "employees of Corizon and not the MDOC" and thus were not required to be exhausted).

*Jones*, 549 U.S. at 200.   In Michigan's correctional facilities, prisoner grievances are governed by MDOC Policy Directive 03.02.130, entitled "Prisoner/Parolee Grievances" (the "Policy").   (ECF No. 37-2, PageID.262).[6]   "Grievances may be submitted regarding alleged violations of policy or procedure or unsatisfactory conditions of confinement which directly affect the grievant, including alleged violations of this policy and related procedures."   (*Id.* at ¶E).   As to the rules concerning the content of written grievances, the "[i]nformation provided is to be limited to the <u>facts</u> involving the issue being grieved (i.e., who, what, when, where, why, how).   Dates, times, places, and names of all those involved in the issue being grieved are to be included."   (*Id.* at ¶R; ECF No. 15-2, ¶P).

A state prisoner must first complete the process outlined in the Policy – including pursuing a grievance through "all three steps of the grievance process" – before he can file a lawsuit challenging the alleged unlawful conduct.   (ECF No. 37-2, ¶B).   The Policy provides that, "[p]rior to submitting a written grievance, the grievant shall attempt to resolve the issue with the staff member involved within two business days [], unless prevented by circumstances beyond his/her control or if the issue is believed to fall within the jurisdiction of Internal Affairs."   (*Id.* at ¶P).   If a prisoner cannot resolve his dispute with the staff member involved, he has five business days to file a Step I grievance.   (*Id*. at ¶¶P, V).   If the prisoner is dissatisfied with the Step I response, he may submit a grievance appeal to the Step II Grievance Coordinator within ten business days after receipt of the

---

[6] MDOC Defendants attach the version of the Policy effective 07/09/07 to 03/18/2019.   (ECF No. 37-2).   Corizon Defendants attach the version that supersedes the MDOC's version, effective 03/18/2019.   (ECF No. 15-2).   In any case, as to the issues raised in Willis' complaint, the corresponding provisions of either version of the Policy are the same.

Step I response, or if no timely response is received, within ten business days of the date the response was due. (*Id.* at ¶BB). If the grievant is dissatisfied with, or does not receive, a Step II response, he has ten business days within which to file a final appeal at Step III. (*Id.* at ¶FF). Again, an inmate may only pursue a claim in court if he has complied with his obligations at each of these three steps. (*Id.* at ¶B).

### b. Discussion

Each group of defendants argues that Willis failed to properly exhaust his deliberate indifference claims against them. (ECF No. 15, PageID.78-82; ECF No. 26, PageID.133-37; ECF No. 33, PageID.226; ECF No. 37, PageID.250-56). Salient MDOC records show that Willis exhausted only one grievance, JCF-18-12-2677-28C ("JCF-2677") through Step III of the grievance process, but that this particular grievance did not involve complaints related to medical care. (*See, e.g.*, ECF No. 37-3, PageID.271-76; *see also* ECF No. 49, PageID.442 (Willis acknowledging that he "did not raise any of the health care claims in [] JCF-2677."). Thus, the JCF-2677 grievance cannot have exhausted any of Willis' claims in this case. This does not end the analysis, however, because Willis contends he properly exhausted his claims through another grievance, JCF-18-12-2617-12E3 ("JCF-2617").

In JCF-2617, Willis did raise complaints concerning the medical treatment he did and did not receive on June 6 and 7, 2018. (ECF No. 1-3). The questions are whether (1) despite the fact that the JCF-2617 grievance does not appear on the MDOC's record of exhausted grievances, Willis did in fact satisfy the exhaustion requirements for that grievance through Step III, and, (2) if so, whether he properly identified the defendants in that grievance such that each defendant had sufficient notice of Willis' deliberate

12

indifference claims against them.  For the reasons discussed below, (1) material factual questions exist as to whether Willis exhausted JCF-2617 through Step III of the grievance process, and (2) JCF-2617 can only be fairly read to have exhausted claims against defendants Nurse Sophia Bradley, Nurse Laura Davenport, and EMS Paramedic Darel Woolsey.

> i.  *Material Questions of Fact Exist as to Whether Willis Exhausted JCF-2617 Through Step III*

To begin, the Corizon Defendants, MDOC Defendants, and Radiologist Defendants argue that Willis failed to exhaust JCF-2617 through Step III of the grievance process because it was "rejected" at Step III for failure to follow grievance procedures.  (ECF No. 15, PageID.79-81; ECF No. 26, PageID.136-37; ECF No. 37, PageID.255-56).  In doing so, they rely on affidavits from Richard Russell, the MDOC's Hearings Administrator and Manager of the Grievance Section in the Office of Legal Affairs in Lansing, Michigan, in which Russell attests that JCF-2617 was "rejected" at Step III because Willis "did not submit his Step II materials as required" when he filed his Step III Appeal.  (ECF No. 15-3, PageID.102-03; *see* ECF No. 56-1, PageID.510-11 ("Because JCF-2617 does not appear in the Step III Grievance Report [], it means that Willis' Step III submission . . . was incomplete . . . [and] that Willis did not resubmit a complete Step III appeal packet for JCF-2617.").  Relevant here, Russell's affidavit appears to be based on a letter that he sent to Willis on "6/13/19" titled, "RE: Attempt to File a Step III Grievance Appeal," which states, "Your correspondence(s) is being returned to you for the following reason(s): ... You did not include the Step II response(s) **or provide a valid reason why it could not**

**be included**." (*Id.*, PageID.41) (emphasis in original).  As discussed below, this argument lacks merit because the Policy does not appear to require a grievant to supply the Step II response with his Step III appeal, and, at any rate, material questions of fact exist as to whether Willis attached the Step II response to his Step III appeal.

First, the MDOC's Step III procedures specified in the Policy do not state that a grievant must attach all relevant documentation from Steps I and/or II to his Step III appeal; rather, the Policy merely states, "[t]o file a Step III grievance, the grievant must send a completed Step III grievance, using the Prisoner/Parolee Grievance Appeal form (CSJ-247B), to the Grievance and Appeals Section within ten business days after receiving the Step II response . . ." (ECF No. 37-2, PageID.267, ¶ FF; *see also* ECF No. 15-2, PageID.97, ¶ HH (same)).  Here, there is no dispute that Willis sent a Step III Appeal on a completed form CSJ-247B, which appears to be all that was required under the Policy.  (ECF No. 1-3, PageID.38, 40).  Moreover, Russell's affidavit detailing the reasons why JCF-2617 was rejected and why it was not recorded in the Step III Grievance Report appears inconsistent with the Policy.  Whereas Russell asserts that Willis' Step III Appeal of JCF-2617 was rejected due to his failure to attach the Step II Response, ¶H of the Policy specifically provides that "***grievances shall not be rejected or denied solely because the prisoner has not included with his/her grievance exhibits or other documents related to the grievance***. ... If the grievance references documents and those documents are not in the prisoner's files or otherwise available to the grievance coordinator or respondent except through the prisoner, the documents shall be reviewed with the prisoner as part of the grievance investigation process." (ECF No. 37-2, PageID.263, ¶H; ECF No. 15-2, PageID.92, ¶H)

14

(emphasis added).  Finally, while Russell attests that the "fact that JCF-2617 does not appear in the Step III Grievance Report [] means that Willis did not [submit or] resubmit a complete Step III appeal packet," the Policy makes clear that "[e]ach grievance *received* at Step III, *including those which may be rejected*, *shall be logged on a computerized grievance tracking system*.  The tracking system shall include information on the subject matter of *each grievance received* and, *for rejected grievances, the basis for the rejection.*"  (ECF No. 37-2, PageID.267, ¶ GG; *see also* ECF No. 15-2, PageID.97, ¶ II (same)).  Russell's letter to Willis confirms that Russell at least *received* the Step III appeal of JCF-2617, and even if there was a basis to reject such grievance, the Policy provides that JCF-2617 should have still been logged into the Step III Report.  Thus, a question of material fact exists as to why JCF-2617 was not logged in the Step III Report.

Second, even assuming Willis was required to attach the Step II response to his Step III appeal, viewing the record in the light most favorable to Willis as the non-moving party, he presents evidence that at least raises a material question of fact as to whether he satisfied this requirement.  Attached to Willis' complaint and his responses to the defendants' motions are the salient grievance documents related to JCF-2617, *including the Step II Grievance Response* (*see* ECF No. 1-3, PageID.39; ECF No. 46, PageID.372; ECF No. 48, PageID.418-24; ECF No. 49, PageID.458), which *Willis contends he provided as part of his Step III Appeal* and was "received in the office of Legal Affairs [] with all required documents attached . . ."  (ECF No. 46, PageID.352; *see also* ECF No. 49, PageID.442 ("Russell refused to record the filing of [Willis'] complete grievance [in JCF-2617] . . . to make it seem that [] Willis never filed them at all, where he then fabricated a false notice

15

of deficiency letter, and fake affidavit stating that [JCF-2617] was in[]complete in its filing, which it[] was not . . .").  Willis' Step III appeal specifically indicates, "See Attachments" – plural – yet his actual appeal was attached as *a single page*.  (ECF No. 1-3, PageID.38, 40).  This suggests Willis' Step III appeal was accompanied by other materials, which he avers included the Step II response.  Thus, viewing the evidence in the light most favorable to Willis, a question of fact exists as to whether he attached the Step II Response when filing his Step III appeal.  Thus, defendants are not entitled to summary judgment based on this issue.

### ii. *JCF-2617 Only Exhausted Claims as to Nurse Sophia Bradley, EMS Paramedic Darel Woolsey, and Nurse Laura Davenport*

Corizon Defendants, Radiologist Defendants, and Henry Ford Defendants alternatively contend that Willis did not file any grievances (JCF-2617 or otherwise) naming them such that they would be sufficiently put on notice of his deliberate indifference claims against them.  (ECF No. 15, PageID.81; ECF No. 26, PageID.135-36; ECF No. 33, PageID.226).

Willis responds that JCF-2617 "proves complete exhaustion according to its language" because his grievance generally states "MDOC 'employees' and Corizon 'contractors' were deliberately indifferent under the Eighth Amendment for refusing to treat [his] serious medical needs of a Stroke/Heart Attack, and Narcan Poisoning."  (ECF No. 46, PageID.360; ECF No. 48, PageID.400).  He further asserts that "the reason why MDOC employees and Corizon contractor[s] [were] named initially" is because, at the time of filing his grievance, "there was no way possible [he] could have known who these

16

Defendant[s] [were] and what th[eir] deliberate indifference violations [were]."  (ECF No. 46, PageID.360-61; *see* ECF No. 45, PageID.325-26; ECF No. 48, PageID.410-11).

Relevant here, the Policy lays out the grievance process applicable to JCF-2617, which specifically requires that "[d]ates, times, places, and names of all those involved in the issue being grieved are to be included."  (ECF No. 37-2, PageID.265, ¶R; ECF No. 15-2, PageID.94, ¶S (same)).  The Sixth Circuit has also made clear that the failure to comply with this requirement mandates dismissal of such claims based on a failure to properly exhaust administrative remedies.  *See, e.g.*, *Hall v. Warren*, 443 F. App'x 99, 105 (6th Cir. Oct. 18, 2011) ("[MDOC Policy] specifically requires the grievance to include the dates, times, places, and *names of all those involved in the issue being aggrieved*.") (emphasis in original)).  For the reasons below, a review of JCF-2617 reflects that, among the defendants named in Willis' complaint, this grievance can only be fairly read to have brought claims against Nurse Bradley, Nurse Davenport, and Paramedic Woolsey.

While somewhat difficult to decipher based on the quality of the document attached to Willis' complaint and responses, JCF-2617 states as follows:

> The below mentioned MDOC employees and Corizon contractors were deliberately indifferent and demonstrated reckless disregard for my safety and medical needs in violation of my 8th Amendment Rights by failing to act reasonably when I suffered a serious medical emergency on or about June 7, 2018, at the Cotton Correctional Facility.  I became unconscious ... from a possible stroke or cardiac arrest and the enclosed mention [sic] MDOC employees failed to [assess] my vital signs.  I was dragged across the bathroom floor by my legs according to several witnesses ... [and] administered an excessive amount of narcan [] doses ... [despite] the fact I had not consumed any illegal drugs or showed signs of overdosing.  Due to the [failure] of these employees to provide [] oxygen or perform CPR or other required [medical care] ... [I] suffered [ailments] that [I] did not suffer prior to these defendants' []

17

medical care and [handling of my] medical emergency.

(ECF No. 1-3, PageID.34).   Willis then identifies what appears to be several specific MDOC correctional officers, as well as "Shift Nurse Jane Doe 1," "Nurse Jane Doe 2," "Nurse John Doe 3," "Emergency Ambulance Team John Doe 1," and "Ambulance team John Doe 2," as well as "others to be discovered via housing unit security cameras, log book, and critical incident reports . . ." (*Id.*).

A Step I Grievance Response reflects an investigation summary, which states:

> Per EMR: On 06/7/18 healthcare received a phone call requesting medical assistance.  Grievant was unresponsive and vital signs were taken, EMS dispatched by custody.  Oxygen applied via NC at 4 liters per minute, 2mg Narcan IM to left thigh with no effect.  Oxygen titrated to 15 liters per minute via non rebreather mask.  AED applied, no shock advised.  4mg Narcan intranasal, 2mg Narcan IM to right thigh with resulting respirations 12/min, oxygen desaturation, tachycardia with irregular beat and regular strength, LOC unchanged.  Preparing for IV insertion when EMS arrived on site and continued plan of care.  Blood glucose 338.  Paramedics report states "provider's impression was poisoning/drug ingestion and improved responsiveness upon administration of op[i]oid antagonist.["]

(ECF No. 1-3, PageID.36).  JCF-2617 was then denied at Step I because "[g]rievant received appropriate care for medical emergency and per EMR / ER Report grievant responded after receiving 3 doses of narcan which would indicate a possible opioid over dose."  (*Id.*).

Willis appealed JCF-2617 to Step II, asserting that the respondents at Step I "reframe[d] the nature of [his] complaints" and, notably, clarified the claims in his Step I grievance were only being made against a few individuals:

> ***At the heart of the Step 1 grievance*** is my complaint that I suffered from a possible stroke or heart attack, was rendered unconscious in the

18

bathroom and that without diagnosing the medical issue itself, **RN Laura B. Davenport** (named in Step 1 as "Nurse 2")[] and **RN Sophia Bradley** (named in Step 1 as "Nurse 1") administered an excessive amount of Narcan into my system.  Further, I complained that I had not overdosed from any drugs and there was no reason to administer Narcan.  Officer Payton and Farhat[] told Nurse Bradley and Davenport this fact. . . . Finally, I complained that failing to diagnose the actual medical issue and administering the wrong drug (Narcan) caused irreparable damage to my health and safety, (i.e. memory loss, neurological and brain damage, circulatory and reproductive malfunctions, loss of bladder control and kidney failure).

\* \* \* \* \* \* \* \* \*

[] Respondent claims that "Per EMR/ER Report grievant responded after receiving 3 doses of Narcan which would indicate a possible opioid overdose" (EMR/ER John Doe 1 and 2).  It is questionable, without more, that this happened as described by Respondents.  Moreover, even if it is true that a patient responds after 3 doses of Narcan it does not thereby follow that he has overdosed.  This is especially true in this case where there was no such overdose.  ER was heard asking Nurse Bradley and Nurse Davenport, "what happened?"  So the Paramedics (John Doe 1 & 2) only knew what the Corizon Nurses told them . . .

\* \* \* \* \* \* \* \* \*

. . . The grievance should be upheld at this Step and sent back to Step 1 for a full and proper investigation.  EMR/ER (John Doe 1 and 2) should be questioned and investigated also.

(ECF No. 1-3, PageID.35, 38) (emphasis added).

The MDOC's Step II Response denying his appeal states that Willis was "treated for an emergency; possible overdose.  Signs of opioid overdose include; [sic] slowed breathing, or no breathing; very small or pinpoint pupils in the eyes; slow heartbeats; or extreme drowsiness, especially if you are unable to wake the person."  (*Id.*, PageID.38-39). It also states that Willis was "treated until [his] return of spontaneous respirations occurred

19

[].  Per Narcan standing orders; [sic] Narcan may be repeated with a maximum of 10 mg."

(*Id.*, PageID.38-39).

In his Step III Appeal, Willis continued to challenge the MDOC's construction of his Step I grievance and, again, specified that his claims in JCF-2617 were narrow and only against a few specific individuals:

> Again, rather than address claims as presented the Respondent, as in Step 1, focuses on changing the nature of the claims and engages in continued subterfuge in its responses.  The Step 1 Respondent said the Grievant complained that "I was given Narcan and not given appropriate care for a medical emergency."  The Step 2 Respondent now says, "Grievant alleges nursing administered an excessive amount of Narcan."  Indeed, that is part of the "factual background" of the case.  However, it is not grievant's claim.  ***Properly stated, and here again, Grievant claimed that he suffered from a possible stroke or heart attack, was rendered unconscious in the bathroom and that without diagnosing the medical issue itself, RN Laura B. Davenport (terminated/resigned) and RN Sophia Bradley negligently administered an excessive amount of Narcan into my system. Grievant also complained that he had not overdosed from any drugs (as his medical records from Allegiance Hospital confirmed) and there was no reason to administer Narcan (something ignored here by respondents)*** . . . .

(ECF No. 1-3, PageID.40).

Reading the salient grievance documents together makes clear that Willis failed to indicate JCF-2617 was being pursued against, or concerned anybody other than, the individuals specifically identified therein, *i.e.*, Nurse Sophia Bradley, Nurse Laura Davenport, and Paramedic Darel Woolsey.  At Step I, Willis names "Jane Doe" nurses and "John Doe" ambulance team employees.  (ECF No. 1-3, PageID.34).  Later, at Steps II and III, he expressly clarified that the "Jane Doe" nurses refer "RN Laura B. Davenport" and "RN Sophia Bradley."  (*Id.*, PageID.38, 40).  While Willis never specifically names

Woolsey, his specific naming of an "Emergency Ambulance Team John Doe" at Step I, his subsequent naming of the "Paramedics" as "EMR/ER John Doe 1 and 2" in Step II, and his requests that these EMR/ER John Does be "questioned and investigated," is sufficient to give notice to Paramedic Woolsey – the only EMS paramedic who was at the scene of the JCF incident at issue in this complaint – of Willis' claim against him.  (*Id.*, PageID.34, 40).[7]

Moreover, not only does JCF-2617 fail to *name* defendants other than Bradley, Davenport, and Woolsey, it also fails to specify the "[d]ates, times, [and] places" relevant to the deliberate indifference claims raised against the other defendants in Willis' complaint.  A fair reading of JCF-2617 reflects claims regarding the medical treatment Willis received on "June 7, 2018" at the "Cotton Correctional Facility," during which he was "dragged across the bathroom floor," "administered an excessive amount of narcan," and not provided with "oxygen or [CPR] or other required [medical care]."  (ECF No. 1-3, PageID.34; *see id.*, PageID.40 ("Properly stated, and here again, Grievant claimed that he suffered from a possible stroke or heart attack, was rendered unconscious in the bathroom and that without diagnosing the medical issue itself, RN Laura B. Davenport (terminated/resigned) and RN Sophia Bradley negligently administered an excessive amount of Narcan into my system.").  JCF-2617 does not otherwise specify the dates, times, or places the other defendants subsequently encountered and/or treated him, *i.e.*, the hospital.  Even liberally construed, the only reference to a place and time outside of the

---

[7] MDOC Defendants, who carry the burden on the issue of exhaustion, present no arguments whatsoever concerning the sufficient naming of individuals in JCF-2617.

incident at JCF appears to be in the context of his Step II appeal contesting the MDOC's

Step I determination that he received "appropriate care for [his] medical emergency," in

which he states:

> [T]he investigation itself was insufficient. ***I was in the hospital from
> the date of this incident until discharged in December 2018. During
> this period, and as a direct result of the Narcan, I flat-lined and went
> into a coma and I now suffer permanent injuries as described above.
> Additionally, I underwent an extensive amount of diagnosis and
> treatment which resulted in medical determinations by doctors. All of
> this was intentionally ignored by the investigation by Respondents.***
> Stated plainly, had the Respondent's not intentionally injured me with
> Narcan and adequately investigated my vital signs and medical
> condition, they would have been in a better position to conclude that I
> "received appropriate care for this medical emergency."

(ECF No. 1-3, PageID.38) (emphasis added).  Even viewed in the light most favorable to

Willis, the above cannot be fairly read as raising an Eighth Amendment challenge to the

medical treatment he subsequently received *at the hospital after* the "date of *this incident*"

at JCF.

    While Willis argues that "[i]t is not [his] fault that Corizon and the MDOC []

contracted Henry Ford Allegiance Hospital who employed [the Radiologist Defendants]"

(ECF No. 48, PageID.401), and that his naming of "MDOC employees" and "Corizon

contractors" in JCF-2617 generally gave all relevant medical officials who subsequently

treated him sufficient notice of his claims for deliberate indifference, the Sixth Circuit's

analysis in *Mattox v. Edelman*, 851 F.3d 583, 596 (6th Cir. 2017) belies that argument:

> Mattox additionally argues that his original three grievances generally
> gave all relevant medical officials notice of his claim that he was
> receiving inadequate heart treatment, and that this general notice was
> sufficient to exhaust all possible claims related to his heart treatment.
> We cannot credit Mattox's argument, however, because it would

effectively collapse the PLRA's exhaustion requirement. If generalized dissatisfaction with an inmate's medical care were sufficient to exhaust all possible claims related to that care, then prisoners could bring claims in federal court without ever giving prison staff a fair chance to remedy a prisoner's complaints. When an inmate is receiving *little or no medical care at all*, it might arguably be appropriate to generally allege inadequate medical care. However, where, as here, an inmate is receiving care, we hold that the inmate can only exhaust claims where he notifies the relevant prison medical staff as to which facets of his care are deficient. This rule better comports with [the MDOC's grievance Policy], which requires inmates to describe the "who, what, when, where, why, [and] how" of their claim.

*Mattox*, 851 F.3d at 596 (emphasis in original). Drawing from *Mattox*, to suggest that Willis' grievance detailing *one specific incident at JCF on June 7, 2018*, of deliberate indifference *by nurses and emergency paramedics* in addressing a serious medical need was sufficient to give notice of deliberate indifference claims against all subsequent medical providers who saw and/or treated him – *at a later time and at a different place* – over the *next six months* would "effectively collapse" the PLRA's exhaustion requirement and render meaningless the "require[ment] [for] inmates to describe the 'who, what, when, where, why, [and] how' of their claim." *Mattox*, 851 F.3d at 596.[8]

    Based on all of the foregoing, the Court finds that, among the defendants named in Willis' complaint, JCF-2617 can only be fairly read to have exhausted claims against Nurse

---

[8] This analysis likewise applies to Willis' reference at Step I that there were "others to be discovered via housing unit security cameras, log book, and critical incident reports," as JCF-2617 can only be read as grieving the incident at JCF. (ECF No. 1-3, PageID.34). Moreover, as discussed above, Willis subsequently specified in Steps II and III that his claims are against Nurses Bradley and Davenport, as well as the paramedics who were involved, *i.e.*, Paramedic Woolsey, for their handling of the medical emergency that took place at JCF. (*Id.*, PageID.34, 40); *see also Dykes-Bey v. Finco*, No. 20-1624, 2021 WL 2767584, at *2 (6th Cir. Feb. 2, 2021) (stating that a plaintiff did not exhaust claims against certain defendants by failing to name them "during any step of the grievance process," and that "prison officials would naturally assume that [plaintiff] complied with the requirement to name those involved" as to those defendants that he did name).

Sophia Bradley, Nurse Laura Davenport (who presently has not been served), and Paramedic Darel Woolsey.   Accordingly, on the issue of exhaustion, the MDOC Defendants' motion should be denied as to Willis' claims against Nurse Bradley and Paramedic Woolsey, and the dispositive motions filed by Corizon Defendants, Radiologist Defendants, and Henry Ford Defendants should be granted.[9]

## 2. Eleventh Amendment Immunity

The MDOC Defendants seek to dismiss Willis' § 1983 official capacity claims against state officials Nurse Bradley, Paramedic Woolsey, and Warden Stewart, as well as DWH (which is a "subsidiary agency of the MDOC") based on Eleventh Amendment immunity.   (ECF No. 37, PageID.256-57).   The Eleventh Amendment prohibits suits in federal court against the state or any of its agencies or departments unless the state has waived its sovereign immunity.   *See Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 99 (1984).   Relevant to this case, the Sixth Circuit has specifically held that MDOC employees are entitled to sovereign immunity from official capacity § 1983 claims:

> Because sovereign immunity extends to state instrumentalities, and the MDOC is an arm of the State of Michigan, the MDOC is entitled to sovereign immunity on the § 1983 claim as well.   Moreover, the named Defendants, in their official capacities, are similarly entitled to immunity with respect to [Plaintiff's] § 1983 claim because a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office, which is no different from a suit against the State.

---

[9] Because Willis' federal claims against the Corizon Defendants, Radiologist Defendants, and Henry Ford Defendants should be dismissed, the Court should also decline to exercise supplemental jurisdiction as to Willis' state law claims against these three groups of defendants. *See Gamel v. City of Cincinnati*, 625 F.3d 949, 952-53 (6th Cir. 2010).   Thus, those state law claims should be dismissed without prejudice.

*McCoy v. Michigan*, 369 F. App'x 646, 653-54 (6th Cir. 2010) (internal citations and quotations omitted).  However, Eleventh Amendment immunity does not apply where the plaintiff's "suit against a state official seek[s] prospective injunctive relief to end a continuing violation of federal law." *See Carten v. Kent State Univ.*, 282 F.3d 391, 398 (6th Cir. 2002) (citations omitted); *see also Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 255 (2011) ("a court need only conduct a straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.") (quotations omitted); *Ex parte Young*, 209 U.S. 123 (1908).

Here, because Willis' complaint seeks only money damages, the law is clear that Eleventh Amendment immunity applies to his claims against the MDOC and DWH as a "subsidiary agency of the MDOC," as well as Bradley, Stewart, and Woolsey in their official capacities as state officials of the MDOC[10] and DWH.  (ECF No. 37, PageID.256-57); *Pennhurst State School & Hosp.*, 465 U.S. at 99; *McCoy*, 369 F. App'x at 653-54. Moreover, both of Willis' arguments in response to MDOC Defendants' motion – that (1) "Defendants are not entitled to qualified immunity" because he demonstrated a violation of a "clearly establishe[d] [] constitutional [] right" (ECF No. 49, PageID.448); and (2) immunity "does not apply to claims for injunctive relief," as he is "requesting for immediate termination of all Defendant[s'] licen[s]es and jobs under declaratory and injunctive relief" (ECF No. 49, PageID.447, 449) – lack merit.

---

[10] Obviously, the same is true with respect to defendant Davenport.

First, Willis appears to misinterpret MDOC Defendants' assertion of Eleventh Amendment sovereign immunity, given that he disputes their entitlement to "qualified immunity" based on a violation of clearly established constitutional rights. Such argument is misguided, as Eleventh Amendment sovereign immunity is separate and distinct from qualified immunity (which MDOC Defendants have not raised in this case). Second, while Willis contends *for the first time in his response to MDOC Defendants' motion* that he seeks declaratory and injunctive relief, he sought no such relief in his complaint, which only requests money damages "in the amount of no less than [] $50,000,000.00[], as well as punitive damages and reasonable attorney's fees with such further relief as [] deem[ed] just and proper under the law." (¶¶ 62, 74, 84, 134; *see also* ¶¶ 93, 100, 107, 117).[11]

Accordingly, Willis' official capacity claims against the MDOC Defendants and defendant Davenport should be dismissed.

### 3. Failure to State a Claim

As detailed above, dismissal of Willis' claims for failure to exhaust administrative remedies is a sufficient basis for granting each of the dispositive motions filed by the Corizon Defendants, Radiologist Defendants, and Henry Ford Defendants. Nonetheless, it is worth briefly addressing the Radiologist Defendants' and Henry Ford Defendants' arguments that all claims against them should alternatively be dismissed under Fed. R. Civ. P. 12(b)(6) for failing to properly plead a constitutional violation under Section 1983.

In order to demonstrate liability under § 1983, a plaintiff must first establish that

---

[11] Moreover, Willis cannot raise new claims for relief in a response brief, and in any event, he has pointed to no law that would give this Court the ability to revoke any of the defendants' licenses.

*each named defendant* acted under color of state law and that his or her actions violated rights secured by the Constitution and/or laws of the United States.  *See Baker v. McCollan*, 443 U.S. 137 (1979).  The plaintiff also must make a clear showing that each named defendant was *personally involved* in the activity that forms the basis of the complaint.  *See Rizzo v. Goode*, 423 U.S. 362, 377 (1976); *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984).  Moreover, § 1983 liability cannot be premised upon mere allegations of *respondeat superior*; rather, in order for a party to be held liable under § 1983, there must be a showing that the party personally participated in, or otherwise authorized, approved, or knowingly acquiesced in, the allegedly unconstitutional conduct.  *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978); *Phillips v. Roane Cty., Tenn.*, 534 F.3d 531, 543 (6th Cir. 2008).

In terms of Willis' Eighth Amendment claims, the "personal involvement" requirement means that he must allege facts establishing that *each defendant* was deliberately indifferent to his serious medical needs based on *that defendant's own actions*. To do so, Willis must satisfy two elements: one objective, and one subjective.  Specifically, he must show that he had a serious medical need (the objective prong) and that each defendant, being aware of that need, acted with deliberate indifference to it (the subjective prong).  *See Jones v. Muskegon County*, 625 F.3d 935, 941 (6th Cir. 2010).

With respect to the objective prong, a serious medical need must be more than "mere discomfort or inconvenience," *Talal v. White*, 403 F.3d 423, 426 (6th Cir. 2005) (internal quotations omitted), and the Court will assume that Willis' allegations about his conditions (having a heart attack or stroke, being in a coma, etc.) satisfy this prong.  To satisfy the

27

subjective prong, Willis must show that each particular defendant possessed "a 'sufficiently culpable state of mind,' rising above negligence or even gross negligence and being 'tantamount to intent to punish.'" *Broyles v. Corr. Medical Servs., Inc.*, 478 F. App'x 971, 975 (6th Cir. 2012) (quoting *Horn v. Madison County Fiscal Court*, 22 F.3d 653, 660 (6th Cir. 1994)).  Put another way, "[a] prison official acts with deliberate indifference if he knows of a substantial risk by failing to take reasonable measures to abate it.  Mere negligence will not suffice.  Consequently, allegations of medical malpractice or negligent diagnosis and treatment generally fail to state an Eighth Amendment claim of cruel and unusual punishment." *Broyles*, 478 F. App'x at 975 (internal quotations omitted).  As the Sixth Circuit has recognized, these requirements are "meant to prevent the constitutionalization of medical malpractice claims; thus, a plaintiff alleging deliberate indifference must show more than negligence or the misdiagnosis of an ailment." *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001). The *Comstock* court further explained:

> When a prison doctor provides treatment, albeit carelessly or inefficaciously, to a prisoner, he has not displayed a deliberate indifference to the prisoner's needs, but merely a degree of incompetence which does not rise to the level of a constitutional violation.  On the other hand, a plaintiff need not show that the official acted "for the very purpose of causing harm or with knowledge that harm will result."  Instead, "deliberate indifference to a substantial risk of serious harm to a prison is the equivalent of recklessly disregarding that risk."

*Id.* (internal citations omitted).

Courts distinguish between "cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical

28

treatment." *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011) (internal quotations omitted).  "Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976).

Analyzed against these standards, Willis' deliberate indifference claims against the Radiologist Defendants and Henry Ford Defendants clearly fail because Willis admits that they provided him with medical care, but contends merely that that care was negligent because they "fail[ed] to examine [him] and review his medical reports ***thoroughly*** instead of following [defendant Davenport's] initial inaccurate medical report . . ." and "fail[ed] . . . to provide [him] with *appropriate* medical care to diagnose and treat [his] *correct* medical condition . . ."  (ECF No. 1, PageID.13, 23) (emphasis added).

Relevant here, the complaint alleges that, on June 7, 2018, at 5:30 a.m., Willis "first encountered" Pauline Chiu, M.D. inside HFAH, and he appears to take issue with Dr. Chiu because she is listed as the "Admitting Physician" when he was admitted to HFAH.  (¶102 (citing to "Exh.17.p.1.and.4. att."); ECF No. 1-17, PageID.98).  Willis alleges that Dr. Chiu "refused to review [his] prior medical records or request[] a toxicology drug urine screen after admitting [him], so that every doctor there[]after could have [a] general idea of [his] prior medical history and current medical condition before any medical treatment was performed . . ."  (*Id.*).  He then lumps the remaining "34 doctor[]" defendants who subsequently treated him at some point between June 7, 2018, and December 2018, alleging broadly that they failed to "provide [him] with appropriate medical care to

29

diagnose and treat [his] correct medical condition of a stroke and Narcan poisoning, and Narcan overdose, not a drug overdose," failed to "take any necessary further actions to assist [him], despite becoming aware of the [] obvious mistakes after reviewing the toxicology lab reports that proved there were no drugs in [his] system," and failed to "follow-up" on him.  (¶¶109-14).  But Willis attached to his complaint the HFAH medical records, and they clearly establish that the Radiologist Defendants and Henry Ford Defendants provided Willis with continuous medical care throughout his hospitalization. Accordingly, Willis' claims against these defendants are, at best, claims of medical negligence, which, as discussed above, do not give rise to liability under the Eighth Amendment.

To start, HFAH records reflect that Willis' drug urine screen was "taken" ***on the date of his admission on June 7, 2018*** at "***5:20 AM***," the "specimen" was "received" at "***5:29 AM***," and results were returned within the hour at "***06:01 AM***." (ECF No. 1-6, PageID.56-57).  In other words, contrary to his allegations, Willis had already been given a drug urine screen ***ten minutes before*** he allegedly encountered Dr. Chiu for the first time at "5:30 a.m." (*Id.*; ¶102).

Next, the medical records flatly contradict Willis' broad allegations that doctors either failed to "review his medical record" or "ignored" his drug screen results.  For instance, a HFAH "Medical Intensive Care Unit" note by Dr. Colleen Frances and cosigned by Dr. Rami Alzebdeh on ***the date of his admission on June 7, 2018***, makes clear that Willis' patient history was taken by "***Review of EMR/medical records***." (ECF No. 1-20, PageID.130) (emphasis added).  Moreover, under the "Attending Physician Notes and

Attestation" signed and dated that same day, Dr. Rami documents that she "personally saw and examined [Willis] on rounds with my team today," and that his "***urine drug screen was nondiagnostic***."  (ECF No. 1-20, PageID.138) (emphasis added).[12]   Thereafter, his July 18, 2018 "Discharge Summary" documents in detail the extensive medical treatment and care Willis was provided *daily* from the date of his admission on June 7, 2018 – at which time he was brought in a condition with such "sever[e] ... respiratory status" that a "death bed visit was requested and family was able to come bedside" – until the date of his discharge on July 18, 2018 – at which time he had "[c]linically [] improved" to a "fair" condition, was alert and oriented to person and place, and "[s]tanding."  (ECF No. 1-17, PageID.112-17).

In short, the record makes clear that Willis had been given a drug urine screen at the time of his admission to HFAH, that those results were clearly documented in his medical records and considered by the medical personnel, and that he was provided extensive and continuous medical care throughout his six-week hospitalization.  Thus, even if Willis is correct about actions the medical practitioners did not take, his claims concerning the medical treatment he received at the hospital cannot be fairly read to allege more than "negligence or misdiagnosis of an ailment," which is insufficient to state an Eighth Amendment claim.  *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001) ("When a prison doctor provides treatment, albeit carelessly or inefficaciously, to a prisoner, he has

---

[12] Contrary to Willis' conclusory allegations, the record also reflects that medical providers considered the possibility of a "stroke" and/or "stroke-like symptoms."  (*See, e.g.*, ECF No. 1-13, PageID.76 (HFAH Radiology CT Report dated July 3, 2018, in which Drs. Anish Wadhwa and Sireen Reedy note "stroke suspected" and diagnose "[s]troke-like symptoms.")).

31

not displayed a deliberate indifference to the prisoner's needs, but merely a degree of incompetence which does not rise to the level of a constitutional violation."); *see also Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Farmer v. Brennan,* 511 U.S. 825, 835 (1994). Accordingly, Willis' claims against the Radiologist Defendants and Henry Ford Defendants should be dismissed for failure to state a claim. [13] [14]

---

[13] The Court has similar concerns about whether Willis' claims against defendants Davenport, Bradley, Woolsey, and Stewart fail as a matter of law. His claims against Davenport, Bradley, and Woolsey all appear to state mostly, if not entirely, medical negligence claims – indeed, in his Step II appeal, Willis himself wrote that, "[p]roperly stated," his underlying claim is that Nurse Davenport ordered the Narcan injections "without diagnosing the medical issue itself," and that Nurse Bradley – acting at the direction of Nurse Davenport, "negligently administered an excessive amount of Narcan into my system." (ECF No. 1-3, PageID.40). Willis' claim against Woolsey appears to be that in choosing a course of medical care, he "rel[ied] on a inaccurate misdiagnosis" provided to him by Nurse Bradley rather than performing his own independent analysis of Willis' condition. (ECF No. 1, PageID.15). Indeed, Willis admits that Woolsey did "not know[] that [he] had already been given 12 mg. of Narcan" when Woolsey made the decision to provide an additional 10 mg. Narcan shot. (*Id.*). As discussed above, however, claims of medical negligence do not rise to constitutional violations. Willis' claims against Stewart appear to be based on Stewart's supervisory responsibilities as opposed to any direct involvement in the care about which Willis complains. But § 1983 liability cannot be premised upon mere allegations of *respondeat superior*, *i.e.*, supervisory liability; rather, a defendant can only be liable under § 1983 if the plaintiff shows that he personally participated in, or otherwise authorized, approved, or knowingly acquiesced in, the allegedly unconstitutional conduct. *See Monell v. New York City Dept. of Soc. Servs.*, 436 U.S. 658, 691 (1978); *Bellamy*, 729 F.2d at 421. Rather than attempt to fully resolve these issues *sua sponte*, the Court will allow the remaining defendants to raise the issues through a proper motion should they so desire, which will give Willis an opportunity to formally present any counter-arguments.

[14] On November 15, 2021, Willis filed a motion to amend his complaint (ECF No. 44), seeking to add "eight" additional doctor defendants who were "named in the caption of the original Complaint and argued under a denial of medical care because of [their] inactions of deliberate indifference[s], but [were] mistakenly left out of the language concerning [their] names being identified on [¶]109 [of the complaint]." (ECF No. 44, PageID.294-94). Specifically, Willis seeks to add the names and treatment dates of these eight doctors who saw him between "6/21/18" and "11/29/18" into the paragraph of his original complaint in which he had lumped together the "34 doctors." (*See* ¶109). In response, Radiologist Defendants, Henry Ford Defendants, and MDOC Defendants argue that such proposed amendments should be denied as futile. (ECF Nos. 51 ,52, 55). For the reasons discussed above regarding his failure to exhaust administrative remedies and his failure to state a claim, the Court agrees that the proposed amendment to add these eight doctors would be futile. *See Crawford v. Roane*, 53 F.3d 750, 753 (6th Cir. 1995) (stating courts should deny a

## III.   CONCLUSION

For the reasons set forth above, **IT IS RECOMMENDED** that:

- The dispositive motions filed by the Corizon Defendants **(ECF No. 15)**, Radiologist Defendants **(ECF No. 26)**, and Henry Ford Defendants **(ECF No. 33)** be **GRANTED**;

- The MDOC Defendants' motion for summary judgment **(ECF No. 37)** be **DENIED** as to Willis' claims against Sophia Bradley, Darel Woolsey , and Anthony Stewart in their individual capacities, and **GRANTED** as to the dismissal of Willis' official capacity claims; and

- All claims against defendants other than the individual capacity claims against defendants Anthony Stewart, Sophia Bradley, Laura B. Davenport, and Darel Woolsey be **DISMISSED**, with Willis' state law claims being **DISMISSED WITHOUT PREJUDICE**.

Dated: July 18, 2022                          s/David R. Grand
Ann Arbor, Michigan                       DAVID R. GRAND
                                                        United States Magistrate Judge

## <u>NOTICE TO THE PARTIES REGARDING OBJECTIONS</u>

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir.1991);

---

motion to amend "if the amendment is brought in bad faith, for dilatory purposes, results in undue delay or prejudice to the opposing party or would be futile."); *Moore v. City of Paducah*, 790 F.2d 557, 559 (6th Cir. 1986) ("The decision as to whether justice requires the amendment is committed to the district court's sound discretion.").  Accordingly, the Court will enter a separate Order denying Willis' motion to amend (ECF No. 44).

*United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir.1981).  The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir.1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir.1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.  A party may respond to another party's objections within 14 days after being served with a copy.  *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. §636(b)(1).  Any such response should be concise, and should address specifically, and in the same order raised, each issue presented in the objections.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on July 18, 2022.

s/Eddrey O. Butts
EDDREY O. BUTTS
Case Manager
